**MICHIGAN PEAT, Plaintiff,**

**v.**

**REGIONAL ADMINISTRATOR OF REGION V OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; the United States Environmental Protection Agency; the United States of America; Russell J. Harding, Director of the State of Michigan Department of Environmental Quality; State of Michigan Department of Environmental Quality; and State of Michigan, Defendants.**

No. 97–72336.

United States District Court,
E.D. Michigan,
Southern Division.

May 11, 1998.

Steven D. Weyhing, Ann Arbor, MI, for Plaintiff.

Joshua M. Levin, Washington, D.C., for federal government.

Stanley F. Pruss, Lansing, MI, for state government.

## MEMORANDUM AND ORDER GRANTING MOTIONS TO DISMISS

COHN, District Judge.

### I.

This is an environmental case involving the Clean Water Act, 33 U.S.C. § 1251 *et seq.* Plaintiff Michigan Peat is suing federal defendants the United States of America, the Environmental Protection Agency, and the Regional Administrator of Region V of the Environmental Protection Agency (collectively referred to as "EPA"), as well as the State of Michigan, the State of Michigan Department of Environmental Quality, and its director, Russell J. Harding (collectively referred to as "DEQ"). Michigan Peat seeks to enjoin the EPA and the DEQ from exercising oversight or enforcement authority in conjunction with Michigan Peat's attempts to obtain a permit to mine peat on approximately 2800 acres of land. When it failed to secure approval for its peat mining operations, Michigan Peat brought an inverse condemnation claim against the State of Michigan in the Michigan Court of Claims. According to Michigan Peat, the DEQ, anticipating a finding of liability for inverse condemnation, engaged in a "backdoor" deal with federal officials to escape liability, resulting in issuance of a "fictional" permit. Michigan Peat is attacking this perceived collusion.

Now before the Court are the defendants' motions to dismiss. The EPA first argues that the Court lacks subject matter jurisdiction because it has not yet engaged in a final agency action capable of judicial review. For its part, the DEQ argues both that the Eleventh Amendment bars a suit against the State of Michigan without its consent and that Michigan Peat has failed to state a claim upon which relief may be granted.

For the following reasons, the motions to dismiss will be granted.

### II.

#### A.

Michigan Peat owns or controls two noncontiguous parcels of land designated wetlands in Minden Township in Sanilac County, Michigan. Michigan Peat acquired much of the first parcel, called "Minden North," in a land swap with the State of Michigan; Michigan Peat has continuously mined peat from a part of the Minden North site since 1958. Peat mining apparently involves the removal of peat moss by clearing surface vegetation and allowing the peat moss to dry in the sun. Once dried, the peat moss is harvested and bagged, to be sold for horticultural purposes. The process amounts to the discharge of fill material into wetlands.

#### B.

The objective of the Clean Water Act of 1977(CWA) is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," which include wetlands. *See* 33 U.S.C. § 1251(a). The CWA therefore prohibits the "discharge of any pollutant," § 1311(a), including "dredged spoil" or fill material, § 1362(6), except by permit, § 1344(a).[1]

Although the CWA is a piece of federal legislation, the CWA recognizes the "primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id.*

---

1. 33 U.S.C. § 1344 is a codification of § 404 of the CWA; consequently, dredge and fill permits are often called § 404 permits.

§ 1251(b). States may therefore acquire permission to administer their own § 404 permit programs for the discharge of dredged or fill material. *See id.* § 1344(g). Michigan is one of only two states that administers its own permitting program for discharge of dredged or fill material. *See* 40 C.F.R. § 233.70; *see also id.* § 233.71 (describing New Jersey's regulatory program). Wetlands development, which often involves a § 404 permit application, is a particularly thorny environmental issue, as private landowners who seek to develop wetlands often find themselves at odds with permitting authorities. *See* Oliver A. Houck & Michael Rolland, "Federalism in Wetlands Regulation: A Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the States," 54 Md. L.Rev. 1242, 1251–52 (1995). As has been noted, "[i]f states wish to engage in this tough and nasty business well and good, but the ultimate responsibility remains a national one." *Id.* at 1243.

In the complex balance between state and federal authority over the discharge of pollutants into Michigan's wetlands, therefore, federal authority remains the final authority. Among other things, before the State of Michigan may approve a permit application to fill in wetlands, it must transmit a copy of that permit application to the EPA for review; if the EPA objects, the State of Michigan is barred from issuing the permit. *See* 33 U.S.C. § 1344(j); 40 C.F.R. § 233.50. If the State of Michigan does not resolve the EPA's objections to the permit application, default authority to enforce § 404 of the CWA reposes with the Army Corps of Engineers. *See id.*[2]

## C.

In July 1991, the Michigan Department of Natural Resources (DNR)—predecessor to the DEQ as state enforcer of the § 404 permit program—informed Michigan Peat that it needed a permit to continue to mine peat. Michigan Peat therefore filed a § 404 permit application seeking permission to discharge dredged or fill material into wetlands, and specifically to

> [clear] acreage of surface vegetation, [prepare] the peat moss surface for solar drying by discing, and [remove] the dried peat moss surface for storage in windrows prior to screening and bagging for horticultural peat moss-based products.

Michigan Peat also sought to expand its peat mining operations to another parcel of land designated "Minden South." Michigan Peat withdrew its application in January 1993, however, in order to prepare a comprehensive environmental assessment.

In 1994, Michigan Peat filed a second application for permission to discharge dredged or fill material. In September 1994, the EPA examined the environmental assessment prepared by Michigan Peat and notified the DNR that it intended to comment on Michigan Peat's application. The EPA then formally objected to issuance of any permit. On March 21, 1995, the DNR issued findings of fact on Michigan Peat's land to Michigan Peat, in large part finding that "Minden Bog is a rare and irreplaceable wetland ecosystem which has significant ecological and scientific value." The DNR proposed a permit that would have allowed peat mining of less acreage, shorter duration, and more minimized environmental impact than that requested by Michigan Peat. The EPA thereupon withdrew its objections to the permit, and the DNR issued a final permit decision on Michigan Peat's second permit application. The final permit decision specifically:

> • acknowledged that 749 acres of Minden North were mined for peat prior to 1980, and therefore neither the state nor federal government had jurisdiction over them pursuant to § 404 of the CWA.

---

2. The United States Court of Appeals for the Sixth Circuit has described the process as follows:

> If the EPA objects to the application, the state "shall not issue such proposed permit" even after the ninety days have elapsed. The aggrieved state may request a hearing to air its complaints. However, if the state does not request a hearing, or if it fails to modify its plan so as to conform to the EPA's objections, authority to issue the permit is transferred to the Army Corps.

*Friends of the Crystal River v. U.S. EPA,* 35 F.3d 1073, 1075 (6th Cir.1994) (citations omitted).

- classified 202 acres of Minden North as eligible for an "after the fact" permit because Michigan Peat mined the acres prior to the effective date of relevant legislation.
- denied permit authority to mine peat for the remainder of Minden North (approximately 1049 acres) and the entire Minden South parcel (approximately 743 acres).

Michigan Peat did not agree with all the terms of this permit, and it did not sign the permit. The permit therefore did not go into effect.

As for the land subject to an "after the fact" permit, Michigan Peat filed an administrative appeal, opposing conditions imposed by the permit. Michigan Peat also filed on May 1, 1995, a regulatory takings claim against the State of Michigan in the Michigan Court of Claims. This case, which concerns the land on which Michigan Peat was denied permission to mine peat, is apparently still pending.

### D.

In late 1995, § 404 permitting authority was transferred from the DNR to the DEQ, and Russell Harding (Harding) became director of the DEQ. In August 1996, Harding sought the EPA's approval to settle Michigan Peat's inverse condemnation claim, but the EPA rejected the proposal. Michigan Peat again met with DEQ and EPA officials in February 1997, and according to Michigan Peat, the EPA threatened enforcement actions at this meeting.

The DEQ issued a "state only" permit in June 1997, without public notification or participation as required by law. In the cover letter, a DEQ official noted that "[b]ecause of the continued objections of the U.S. Environmental Protection Agency, we are precluded by federal law from authorizing this project under Section 404 of the Clean Water Act. Under the provisions of Section 404, you may seek federal authorization for the project directly from the U.S. Army Corps of Engineers...."[3] Permitting authority thereupon transferred from the DEQ to the Army Corps of Engineers.[4]

### III.

Although Michigan Peat applied to the State of Michigan for a permit to discharge fill material into wetlands, the EPA had the power to comment on and object to any proposed permit, which it did. *See* 33 U.S.C. § 1344(j); 40 C.F.R. § 233.50. And besides the recent issuance of a pre-enforcement compliance order to Michigan Peat, this is all the EPA did. The Court accordingly lacks subject matter jurisdiction because, under the CWA, "judicial review of pre-enforcement orders" by the EPA "is not available." *Southern Ohio Coal Co. v. Office of Surface Mining, Reclamation and Enforcement, Dep't of the Interior,* 20 F.3d 1418, 1426 (6th Cir.), *cert. denied,* 513 U.S. 927, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994) (*SOCCO*).

This limitation on judicial review exists so that when the EPA acts on environmental problems, it does not become "immediately entangled" in litigation. *See id.* "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." [5]

---

3. Michigan Peat suggests impropriety on the DEQ's part because Harding was quoted as follows:

   Mr. Harding told representatives of state environmental groups Thursday that this is a strategic decision, not a matter of the state giving in.

   "On the surface, it could look like the state is acquiescing on this, and we're not," he said. "We're pursuing it on two levels, state and federal."

   Trisha Voner, "Feds to Take over Bog Fight," Port Huron Times Herald, June 6, 1997, at 1A.

4. Subsequent to initiation of suit in this Court, the EPA determined that Michigan Peat was discharging fill material into Minden Bog without a permit. The EPA therefore issued a compliance order instructing Michigan Peat to comply with the CWA. The order also noted:

   Respondents' violation of the terms of this Order may result in U.S. EPA taking enforcement action regarding those Order violations....

   *See* Findings of Violation and Compliance Order (Feb. 4, 1998).

U.S.C. § 704. One example of a final agency action by the EPA would be a civil enforcement action, but threatened enforcement is not reviewable. *See* 33 U.S.C. § 1319(b).[5]

Michigan Peat has failed to show that the EPA has engaged in any action suitable for judicial review; its constitutional claims are also insufficient to establish jurisdiction. *See SOCCO,* 20 F.3d at 1426–27 ("Congress provided one forum in which to address all issues, including constitutional challenges, raised by the issuance of a compliance order: an enforcement proceeding."). Michigan Peat nonetheless cites two cases in support of subject matter jurisdiction, and though creative, Michigan Peat's efforts will go unrewarded. First, the recent Supreme Court case of *Chicago v. International College of Surgeons,* —— U.S. ——, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997), which found that a district court had subject matter jurisdiction to hear a constitutional challenge to a state agency's final decision, *see id.* at 529–30, says nothing about when a district court may interfere in a non-final § 404 permitting process. Second, the Sixth Circuit indeed found that the EPA had engaged in a "final, non-discretionary act" when it withdrew its objections to a permit and thereby transferred authority back to the State of Michigan in *Friends of Crystal River v. U.S. EPA,* 35 F.3d 1073, 1079 (6th Cir.1994). Yet this factual scenario represents the flip side of Mich-

igan Peat's permit applications, and the Sixth Circuit also noted:

> [A]n EPA decision to object does not constitute final agency action, while a decision not to object is within the sole discretion of the agency. Accordingly, neither action may be subjected to judicial review.

*Id.* Here the EPA decided to object to the proposed permits. Such action is pre-enforcement activity, and the Court still lacks jurisdiction to review the EPA's actions.[6]

## IV.

■ The DEQ also moves to dismiss, arguing that the Eleventh Amendment bars suit against the State of Michigan because the State has not consented to be sued. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 72, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States."). The DEQ is correct: nothing indicates that the State of Michigan has waived its Eleventh Amendment immunity. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 239–40, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Michigan Peat has also failed to show that Harding may be sued in his individual capacity under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52

---

**5.** In *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the Supreme Court allowed a federal court to enjoin an agency's action, regardless of finality, when it was "made in excess of its delegated powers and contrary to a specific prohibition in [its enabling] Act." *Id.* at 188, 79 S.Ct. 180.

The Sixth Circuit has recognized, however, that "the *Leedom* doctrine may only be invoked under severely limited circumstances." *SOCCO,* 20 F.3d at 1427. In *SOCCO,* the Sixth Circuit rejected the lower court's finding of jurisdiction on the basis of the *Leedom* doctrine, stating:

> As defendants state, the court seemed to be operating under the assumption that "the mere assertion of a challenge to agency jurisdiction sufficed to invoke the court's jurisdiction under *Leedom*." This assumption is wrong.... *Leedom* is implicated only when an agency's action (or threatened action) is manifestly outside of its delineated authority.

*Id.*

In the present situation, nothing suggests that the EPA acted outside of its authority. The

Court does not have jurisdiction under the *Leedom* doctrine.

**6.** Although Michigan Peat notes that the EPA withdrew its objections to the first permit, Michigan Peat never signed this permit. Whether or not the permit was signed, the EPA's withdrawal of objections alone does not constitute a final agency action.

The Sixth Circuit found final agency action where the EPA withdrew its objections after the 90–day time limit, amounting to the final action by a federal authority because permitting authority transferred back to the State of Michigan. *See Friends of Crystal River,* 35 F.3d at 1079. Unlike *Friends of Crystal River,* here the federal government's role has not terminated with withdrawal of its objections. *See id.* Because the facts of each case differ, the EPA's withdrawal of objections in connection with Michigan Peat's first permit application is not a final agency action.

L.Ed. 714 (1908). As the Supreme Court recently iterated:

> To interpret *Young* to permit a federal court-action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle, reaffirmed just last Term in *Seminole Tribe*, that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, ——, 117 S.Ct. 2028, 2034, 138 L.Ed.2d 438 (1997). Because Michigan Peat has not shown lack of a "state forum available to vindicate federal interests," *see id.* at 2035, and does not seek "prospective injunctive relief based on federal violations" to vindicate a federal right, *see id.* at 2038, all state defendants have Eleventh Amendment immunity. Michigan Peat has merely alleged that the DEQ and its officials adhered to federal law in the § 404 permitting scheme and fully exercised the extent of their authority, thereby rendering the role of the State of Michigan functus officio.[7]

### V.

For the reasons stated above, the EPA's motion is GRANTED, and the DEQ's motion is GRANTED. The case is DISMISSED.

SO ORDERED.

---

[7.] In this regard, the DEQ has also argued that Michigan Peat has failed to state a claim upon which relief may be granted because Michigan Peat essentially requests issuance of a permit to allow it to discharge fill material into wetlands.

The State of Michigan is powerless to grant such relief: as noted above, all § 404 permitting authority has transferred to the Army Corps of Engineers. *See* 33 U.S.C. § 1344(j).